HENRY MEADERS ET AL V. W. P. MOORE ET AL.

No. 7391. Decided October 25, 1939.
Rehearing overruled November 29, 1939.
(132 S. W., 2d Series, 256.)

*Wheeler & Kenyon,* of Gainesville, Georgia, *Frank C. Bolton,*
and *W. W. Caves,* both of Henderson and *Austin F. Anderson,*
of Fort Worth, for plaintiffs in error.

The Court of Civil Appeals erred in holding that the acts of
Moore, in taking deeds to the undivided interests from a part

of the heirs and later making settlements with other heirs of their undivided interest, did not as a matter of law constitute him a cotenant with the appellants. Hess v. Webb, 103 Texas 46, 123 S. W. 111; Peterson v. Fowler, 73 Texas 524, 11 S. W. 534; Satterwhite v. Rosser, 61 Texas 166.

It was error for the Court of Civil Appeals to hold that the exclusive use and enjoyment of the land for a period in excess of ten years is sufficient to raise a question of fact entitling claimant to go to the jury on the issue of limitation, when the evidence shows that during the entire time of his possession he recognized the superior title of others and made settlement with each true owner as he or she appeared, never taking a deed in severalty to the entire tract. Mhoon v. Cain, 77 Texas 316, 14 S. W. 24; Robinson v. Bazoon, 79 Texas 524, 15 S. W. 585; Stephenson v. Barrow, 15 S. W. (2d) 575.

*I. N. Williams* and *McEntire & Shank,* all of Dallas, *Clower & Bezoni,* and *L. L. James,* of Tyler, and *James Young,* of Henderson, for defendants in error.

Plaintiffs in error, having proven by their own testimony that defendants in error are the fee simply owners of the land in controversy, cannot complain of the jury's verdict of the judgment of the trial court vesting title to said property in the defendants in error. Baker v. Cook, 13 Texas 80; Seifert v. Brown, 53 S. W. (2d) 117, 17 Tex. Jur., 929.

Plaintiffs in error are precluded from recoving in this case by the jury's finding and W. P. Moore had ten years' adverse possession of the land in controversy prior to April 14, 1933, and further finding that plaintiffs in error knew that Moore was claiming the land adversely to them. Gibbs v. Lester, 41 S. W. (2d) 28; Brownson v. Scanlan, 59 Texas 222; Illg v. Garcia, 92 Texas 251, 47 S. W. 717.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

Plaintiffs in error were plaintiffs in the district court and we designate them plaintiffs here. Defendant in error Moore and parties holding under him were defendants, and we will designate them as such in this opinion.

The suit, as finally tried, was in the nature of trespass to try title, and plaintiffs sought recovery of an undivided four-fifteenths interest in 80.68 acres of land in Rusk County, which tract appears to have been quite rich in transitory minerals. It will be referred to as eighty acres.

For the purpose of this decision it is taken as proven that plaintiffs held the legal title to said interest as heirs of Jesse Blackwell, John Blackwell and Elizabeth Edge, who in turn were heirs of Jediah and Nancy Blackwell. Defendant Moore, who may be regarded as representative of all defendants, rested his defense upon a claim of title under the ten years statute of limitation. All issues submitted to the jury were found in favor of defendants. As the judgment based on said issues is not attacked, except as being contrary to the law of the case, we think it may be said that the facts upon which the claim of limitation is based, were undisputed. Briefly, the essential facts are these:

Lots 5 and 6 containing eighty acres were a part of a 310-acre tract formerly belonging to Jediah and Nancy Blackwell. In a partition proceeding February 2, 1895, these two lots were set aside to the heirs of Rebecca Anderson, Jesse Blackwell, Elizabeth Edge, Eliza Thompson and John Blackwell jointly. None of these heirs were named and the number of heirs of the parties mentioned was left undisclosed.

The land appears to have been practically useless, except for pasturage, and seems to have been neglected by all parties until the Spring of 1908. At that time defendant Moore fenced the entire eighty acres with a substantial wire fence and began to use same as a pasture for cattle, and to claim same as his own. This use and possession by Moore continued unbroken until the oil boom began in 1931. Thereafter, and until April 14, 1933, when plaintiffs asserted their claim by way of cross action, the land was used by Moore and those claiming under him for the purpose of production of oil. These acts of open and undisturbed adverse possession were undoubtedly sufficient to vest Moore with title under the statutes of limitation, unless his claim was, as a matter of law, impaired by reason of his purchasing certain claims of some of the Blackwell heirs, as hereinafter set out.

On April 8, 1912, Moore took a deed from Jesse Blackwell and wife, Maggie Blackwell to an undivided one-fifth interest in said Lots 5 and 6, identified by reference to the plea of partition, the deed reciting that said interest had been conveyed to R. J. Blackwell by the heirs of Rebecca Anderson August 11, 1905. This deed also conveyed a two-thirds of one-fifth interest in said lots, it being recited that this interest had been conveyed to R. J. Blackwell by the heirs of John Blackwell. The grantor, Jesse Blackwell, was not the Jesse Blackwell to whose heirs an interest in these lots had been set aside in 1895.

On June 13, 1917, Emma Tucker and others executed deed to W. P. Moore for an undivided interest in Lots 5 and 6, and on September 10, 1922, Joel Eaton executed deed to Moore for another undivided interest. Both of these deeds identified Lots 5 and 6 by reference to the partition preceeding of 1895; but, so far as we can ascertain, none of these deeds contained anything to show that the grantors themselves were part of the heirs to whom these lots were set aside.

On May 28, 1931, Moore brought suit in the District Court of Rusk County against Jesse Blackwell, his unknown heirs, and other unknown heirs, for the purpose of clearing title to said lots. Citation by publication was obtained, and eighty-four parties, through numerous attorneys, appeared and claimed interests as heirs of the parties to whom these lots were set aside in 1895. Moore and those holding under him settled this litigation as to all parties appearing as defendants, and judgment was entered against them, as well as all other parties cited by publication. We may state here that the result of all of the conveyances mentioned and the judgment referred to, without regard to the real intent or knowledge of the parties, was to vest in Moore the record title to approximately ten-fourteenths undivided interest in the eighty acres. The record title of plaintiffs to an undivided four-fifteenths interest was not divested, because as to them the judgment mentioned was later set aside.

The three special issues submitted, all of which were answered in favor of defendants, were as follows:

"No. 1. Do you find from a preponderance of the evidence in this case that W. P. Moore, either in person or through a tenant or tenants, or partly in person and partly through a tenant or tenants, held exclusive, peaceable and adverse possession of the land in controversy in this suit, cultivating, using or enjoying the same, for any period of ten years, or longer, prior to April 14, 1933?

"No. 2: Do you find from a preponderance of the evidence in this case that the plaintiffs herein knew that the defendant, W. P. Moore, was claiming the land in controversy in this suit adverse to them?

"No. 3: Do you find from a preponderance of the evidence in this case that the defendant, W. P. Moore, asserted adverse possession, if any, to the property in controversy in this law suit against the plaintiffs such as was and is of such unequivocal notoriety that the plaintiffs would be presumed to have notice of such adverse claim and possession?"

Upon these findings the district court entered judgment in favor of defendants, and this judgment was affirmed by the Court of Civil Appeals. 113 S. W. (2d) 689.

Counsel for plaintiffs have exhibited commendable fairness, as well as great ability, in presenting their case in this court and in the Court of Civil Appeals. Due to their concise, accurrate and fair manner of stating their case, the dominating question of law has been clearly and definitely defined. In the last analysis it amounts to this: Did the acts of Moore in taking deeds to undivided interests in the eighty acres, all of which he undisputably claimed from the Spring of 1908 to the trial of the suit, as a matter of law, constitute recognition of the superior record title of plaintiffs, and have the effect of suspending his adverse claim under the statutes of limitation? The position of plaintiffs is so aptly and concisely stated in their brief in the Court of Civil Appeals that we feel contrained to set same out here:

"1. That from the Spring of 1908 until April 8, 1912, W. P. Moore was in possession of the land in controversy as a mere trespasser without right or title of any kind whatsoever.

"2. That on April 8, 1912, less than ten years after his original entry on the land, W. P. Moore recognized the true title by purchase of the undivided interest of two of the three heirs of John Blackwell and the undivided interest of the Rebecca Anderson heirs from Jesse Blackwell, and became a cotenant with Meaders, et al., and the owner of an undivided five-fifteenths interest in the land, and at that moment his possession lost its claimed hostile character.

"3. That on June 13, 1917, less than ten years after his purchase of the undivided five-fifteenths interest in the land from Jesse Blackwell, W. P. Moore again recognized the true title by purchase of the undivided interest of two of the five heirs of Eliza Thompson from Mrs. Tucker and Mrs. Wood, and again recognized a superior outstanding title, claim or better right in an owner and thereby destroyed the hostile character of any possession claimed by him subsequent to April 8, 1912.

"4. That on September 30, 1922, less than ten years after his purchase of the undivided interest from Mrs. Tucker and Mrs. Wood, W. P. Moore still again recognized the true title by purchase of the undivided interest of another of the five heirs of Eliza Thompson from Joel Eaton, and again recognized a superior outstanding title, claim or better right in an owner

and thereby destroyed the hostile character of any possession claimed by him subsequent to June 13, 1917.

"5. That on May 28, 1931, by the allegation contained in their original petition filed herein on that date, and on or about January 22, 1932, by their purchase of the undivided interest of the heirs of Elizabeth Edge and Eliza Thompson from eighty-four parties defendant in this suit, W. P. Moore, et al., recognized the true title and a superior outstanding title, claim or better right in an owner, and thereby destroyed the hostile character of any possession claimed by them subsequent to September 30, 1922.

"6. That each purchase was a recognition of the true title and each purchase occurred less than ten years after the preceding purchase, the last of which was less than ten years before the cross action of Meaders, et al., was filed herein on April 14, 1933."

Counsel have still in more concise language stated the "controlling question for decision" as follows:

"Did the recognition of the true title by W. P. Moore, et al., by their purchases of undivided interests in it, being an ultimate and controlling fact standing uncontradicted, destroy their claim to the remaining undivided interests based on the ten year statute of limitation?"

It will be noted that they have assumed recognition, as a matter of law, "by their purchases of undivided interests in it." We emphasize the words "as a matter of law," because it seems to us conclusive that unless it be held as a matter of law that the taking of deeds to undivided interests, under the circumstances, constituted a recognition and acknowledgement of the record title in plaintiffs themselves as to their interest, the question has been determined against plaintiffs by the findings of the jury upon the issues of adverse possession. The general finding in favor of adverse possession undoubtedly included a finding of hostility and continuity.

■ Our investigation of the law upon the particular question has been an exhaustive one. The question has often been elaborately and learnedly discussed. We have been unable to find even an isolated decision, with facts and circumstances similar to those involved here, where it has been held as a matter of law that the purchase by an adverse claimant of an undivided interest, absent an avowed intent to give recognition to the superior title in another, constituted such acknowledgement of the true title as would break the continuity, or constitute an abandonment of, the adverse claim. On the contrary, the

overwhelming weight of decisions is that the effect to be given the act of purchase by an adverse claimant, either under color of title or as a trespasser, of an undivided interest in the subject matter of his claim, is a question of fact for decision by a jury or the court; although there are some decisions holding that as a matter of law such action does not constitute a recognition of the true title to such an extent as to change the character of the adverse claim. The rule that the question is usually one of fact is in line with our decisions, as well as decisions of many jurisdictions. Chapman v. Dickerson, 223 S. W. 318; Houston Oil Co. v. Davis, 181 S. W. 851; Anderson v. Proctor Coal Co., 128 S. W. 85; Begley v. Valentine, 160 Ky. 526, 169 S. W. 1026; Ripley v. Miller, 165 Mich. 47, 130 N. W. 345, and Annotation in 24 Ann. Cas. (1912C) 955; Skala v. Lindbeck, 171 Minn. 410, 214 N. W. 271; Oldig v. Fisk, 53 Neb. 156, 73 N. W. 661; Alsworth v. Richmond Cedar Works, 172 N. C. 17, 89 S. E. 1008; American Jurisprudence, Vol. 1, pp. 893-894, Sec. 184, and authorities cited.

The general rule was forcefully stated by the Supreme Court of Tennessee in the case of Headrick v. Fritts, 93 Tenn. 270, 24 S. W. 11, and the language of that opinion has been substantially adopted by text-writers in the courts of many other states: The rule was there stated in this language:

"We are of opinion from the facts in the record that defendant and those under whom he claims have been in possession of the disputed territory since 1883, and that some parts of it have all the while been under actual inclosure, both by defendant and Sims, his predecessor in title. It remains to be considered whether this possession has been adverse and continuous during this time. It is insisted that the continuity of adverse possession, if it ever began, was broken by an offer upon the part of Sims from whom defendant claims title to purchase the lands from the plaintiff. It may safely be assumed as a general proposition that if a defendant in possession of disputed territory concede that the true title is in another and offer to purchase from him, then the continuity of adverse possession is broken. But there is a broad difference between the cases where the real title is conceded and acknowledged to be in another, and an offer or contract is made to buy the title from him as the true owner, and the cases where there is a mere offer to buy in an outstanding claim for the purpose of quieting a title already held, in order to prevent litigation, the defendant in possession has the right to buy in an outstanding hostile claim in order to quiet his own title and possession

under a different title, and he may make such purchase or offer to purchase of the real owner without prejudice to his own adverse holding, provided he buys in such hostile title in order to quiet his own, and not merely as a recognition of the superiority of the adverse title, and his desire to hold under it. Each case will depend upon its own facts and circumstances, and the intention of the parties as to whether the fact of purchase is intended as an acknowledgment of the true title or a mere effort to extinguish an adverse claim; and the solution does not depend merely upon the question whether the party from whom the purchase is made or attempted is or is not the true owner. Every claimant is presumed to have some title, and the defendant is not required at his peril to determine that he is buying from the true owner, but he may buy any adverse claim, whether well or ill founded, in order to protect his own title."

The recent case of Bitonti v. Kauffeld Co., 94 W. Va. 752, 120 S. E. 908, by the Supreme Court of Appeals of West Virginia, contains an able and exhaustive discussion of the question. In that case it is said:

"The decisions of the court, where similar situations have arisen, are legion, and many of them have been cited in the able briefs filed, evidencing much industry and research on the part of counsel. The general rule which may be deduced is that one in possession of land under a valid claim of ownership may fortify his title by purchasing any real or pretended title, without thereby holding in subordination to them, and without interrupting his adverse claim of possession against other outstanding titles, and if the title purchased, or offered to be purchased, be the legal title to the land, then the adverse possession is not broken, if there is no waiver or nonclaim on the part of the person adversely holding the land. But where the party in adverse possession offers to purchase the land from the true owner, knowing him to be such, and the offer is made, not merely to buy an outstanding or adverse claim, in order to quiet his possession or protect himself from litigation, the offer is a recognition of the true owner's title, and will stop the running of the statute."

Further illustrating a distinction which must be carefully observed, the court said:

"It seems to us that there is a very great difference between an offer to buy an outstanding title, which is conceded and acknowledged to be in the true owner, and where an offer

is made, even though it be made to the true owner, for the purpose of quieting a title already held, and in order to prevent litigation. Each case would depend upon its own facts and circumstances and the intention of the parties as to whether the fact of the purchase is an acknowledgment of the true title, or an attempt to extinguish an outstanding title and prevent costs and litigation. It makes no difference whether the offer be made to the true owner or not.

" 'The fact that one believes the outstanding title to be superior so long as he does not yield thereto cannot affect the question, because the character of one's possession depends upon the fact of a claim of ownership, and not its real or supposed validity. In buying what is outstanding there is nothing partaking of the nature of an acknowledgment of the superiority of that title or an abandonment of one's former claim. The old title is not conveyed away or lost. Such an act admits, and admits only, that the occupant deems it worth while to get rid of the outstanding title and unite it to the one under which he has been holding. It does not prove, and alone it does not even tend to prove, a change in the character of the possession or a recognition of a title paramount.' Oldig v. Fisk, 53 Neb. 156, 73 N. W. 661."

■ There are two circumstances, both being present in this case, which have a strong influence in determining the intent of the possessor as to the question of recognition. In the first place, it must be remembered that Moore's claim at all times extended to the whole of the eighty acres, while none of the deeds which he took conveyed more than a small undivided interest. It would be unreasonable to assume that he, by his acts in accepting a deed or deeds to undivided interests, intended to relinquish his claim on the whole, and confine it merely to such undivided interests. This phase of the subject was adverted to by Judge Taft while on the Circuit Court of Appeals in the case of Elder v. McClaskey, 70 Fed. 529. Judge Taft first stated his general conclusion in this language:

"There remains to consider the contention of claimants, sustained by the court below, that, whether the possession of defendants was at any time adverse to the claimants, the disseisin was subsequently purged by recognition and acquiesence of defendants in claimants' title, so that an avowed cotenancy ensued before the statute had run. This contention is chiefly rested on the purchase and acceptance by the defendants of deeds conveying to them outstanding interests of certain of the heirs of the brothers and sisters of William Barr, Sr., whose

title was of the same character as that of claimants. It is well settled by binding authority that a vendee is not estopped to deny the title of his vendor. Robertson v. Pickrell, 109 U. S. 608, 614, 615, 3 Sup. Ct. 407; Watkins v. Holman, 16 Pet. 25, 54; Willison v. Watkins, 3 Pet. 43; Blight's Lessee v. Rochester, 7 Wheat. 535. And the necessary conclusion from this is drawn, in the last-named case, that the person in possession of property under a claim of complete ownership has the right to fortify his title by the purchase of any real or pretended titles, without thereby holding possession in subordination to them."

He then quoted from Mr. Freeman on Cotenancy as follows:

"A person in possession of land may protect himself from litigation by purchasing any outstanding claim against his property. By so purchasing he does not necessarily admit the superiority of the title bought, nor change his possession, which was before adverse, into a possession subordinate to the newly-acquired title. Therefore one who is in possession of real estate does not become a tenant in common thereof by merely accepting a deed therefor from the owner of an undivided interest therein."

We may take occasion here to observe that plaintiffs strenuously contended, as an incident to their main proposition, that the effect of the taking of the deeds to undivided interests was to impose upon Moore the relationship of tenancy in common, regardless of his intention in the matter, or his knowledge of either the extent or true nature of the claims asserted by his grantors. The foregoing quotation from Mr. Freeman answers this contention.

Judge Taft further quoted with approvel from the case of Coakley v. Perry, 3 Ohio St. 344, as follows:

"It would be the grossest absurdity to conclude that Nathan Perry, by taking the conveyance from Job Doan, for a trifling consideration, contemplated, instead of continuing seised of the whole premises, as he claimed to have been before, that he became seised of only an undivided part in common with the other heirs of Job Doan's ancestor. It would seem to be just and reasonable that a person in the bona fide possession of land under a claim of title should be allowed to buy in any title, real or pretended, with a view to quiet the enjoyment of his possessions, and that the purchase of an adversary title, if it does not strengthen, should certainly not have the effect to

impair, the title of the owner. It is not the policy of the law to deter persons from buying their peace, and compel them to submit to the expense and vexatation of lawsuits, for fear of having their titles tainted by defects which they would gladly remedy by purchase, where it can be done with safety."

■ In this connection we are brought to the next circumstance which has a large bearing on the question of intention to recognize the title of plaintiffs and abandon claim under the original entry. Moore, without objection, repeatedly and strenuously asserted that in the taking of the deeds in question he had no intention or idea of recognizing a superior title in the grantors, or in plaintiffs themselves, or to relinquish his claim by limitation. He further asserted that his purpose was to buy his peace and avoid litigation and that after taking each of the deeds he continued to hold possession and to claim the whole eighty acres under his original claim of right, supplemented by whatever title he acquired under the conveyances. He was further emphatic in his declarations that he did not know that any of the grantors were true heirs of the Blackwell heirs to whom Lots 5 and 6 were awarded; that he knew nothing about plaintiffs, and never had any knowledge that they had any real interest in this land. As illustrating the nature of his testimony in this regard we quote as follows:

"Q. At the time that lawsuit was settled, Mr. Moore, had you ever heard of any of the plaintiffs or intervenors in this case that are now claiming this land and claim to be heirs of Jesse and John Blackwell and Mrs. Jesse and Mrs. John Blackwell? A. No., sir.

"Q. Or the Edge heirs? A. No, sir.

"Q. You never heard of them? A. No, sir.

"Q. Mr. Moore, by settling and compromising that lawsuit with that large number of parties, did you intend by doing that to recognize or to concede that these plaintiffs or intervenors or either of them or any of their ancestors ever owned or held any interest in this land? A. No, sir.

"Q. Or anyone else? A. No, sir.

"Q. You did not intend to recognize somebody as a cotenant that you never had heard of, did you? A. No, sir.

"Q. Mr. Moore, by settling and compromising that lawsuit with that large number of parties, did you intend by doing that to recognize or to concede that these plaintiffs and intervenors or either of them or any of their ancestors ever owner or held any interest in this land? A. No, sir.

"Q. You did not intend to recognize somebody as a cotenant that you never heard of, did you? A. No, sir.

"Q. That was true when you took each one of the deeds? A. Yes, sir.

As particularly applicable to the situation thus presented we again quote from the opinion by Judge Taft as follows:

"We have already pointed out why this series of purchases cannot be construed into a change in the adverse holding by Morgan and his grantees against all the world, in view of the course of their dealings with the property, which continued the same from 1860 to 1886. But what we now wish to emphasize is that even if these purchases are to be construed as admissions that the vendors had titles superior to that of the vendees, and as controlling evidence of an intention on the part of the vendees to claim under the title thus acquired, they certainly could not be held to be admissions of title in the claimants, and evidence of an intention to claim under them, whose existence and heirship they did not then suspect, and the heirship of many of whom, on the evidence adduced, they even now deny. A claim of title under an ancestor is not a claim of title under the heir, when the heirship is not known or admitted. Acquiesence in the title of one heir is entirely consistent with a possession adverse to a coheir, when the fact of the relationship between the two is unsuspected or is the point in dispute. The fact of heirship is as material to a title by descent as the existence or validity of a deed to a title by purchase, and acquiesence in the title of the ancestor and some of his heirs is no more an acknowledgment of the title of his unknown heirs than would the recognition of the title of a grantor and some of his grantees be an acknowledgment of the title of other grantees claiming under a deed, the existence, genuineness, or validity of which was not admitted. The contention of the claimants and the holding of the court below on this branch of the case, when reduced to their last logical analysis, amount to this; that when one in the exclusive possession of a tract of land, claiming it in fee under the known heirs of a former owner, is confronted with the claim of one asserting an interest in the property as an hitherto unknown heir of such former owner, and, through fear of its validity, buys it in the confident belief that it is the only outstanding interest, he thereby becomes the avowed cotenant of all other heirs of the same former owner, of whose existence he has no suspicion, so that his possession forever after is their possession. If this is the law, surely it is a trap for the prudent as

well as the unwary. Under such circumstances, to impose on the defendants obligations to the claimants which grow out of the fiduciary relation existing between avowed tenants in common, merely because defendants were trying to strengthen their title as its defects became revealed to them and to avoid the chance of litigation, seems to us to work against them great injustice."

This language is peculiarly pertinent when we consider the fact that when the partition was made in 1895, none of the heirs of the five persons to whom these lots were awarded, were named. Possibly they were then unknown, or were too numerous to mention.

The trial court submitted the case to the jury upon the theory that Moore was possibly a tenant in common with plaintiffs. Complaint is made under certain assignments of error concerning a special instruction relating to this phase of the case. We have, as we believe, demonstrated that Moore, by his various purchases of undivided interests, did not become a tenant in common with plaintiff. This makes it unnecessary to discuss the effect of the instruction. However, we find that the objection to this charge presented in application for writ of error was not made in the trial court. In light of the circumstances, the charge given was strongly favorable to plaintiffs. Under the authority of Moore v. Knight, 127 Texas 610, 94 S. W. (2d) 1137, and Republic Production Company v. Lee, 121 S. W. (2d) 973, the judgment herein might very appropriately be affirmed, in light of the findings of the jury, even if it were conceded that a relationship of tenancy in common existed.

We think the Court of Civil Appeals correctly disposed of the question of improper argument.

For the reasons stated herein, the judgment of the Court of Civil Appeals is affirmed.

Opinion adopted by the Supreme Court October 25, 1939.

Rehearing overruled November 29, 1939.